**CW GOVERNMENT TRAVEL, INC.,**
d/b/a· Carlson Wagonlit Travel,
Plaintiff,

v.

**The UNITED STATES, Defendant,**

and

**Omega World Travel, Inc.,**
Defendant-intervenor.

No. 02–504C.

United States Court of Federal Claims.

Sept. 9, 2002.*

* Opinion originally filed under seal on August 15,　2002.

Lars E. Anderson, Vienna, VA, for plaintiff, Sharon L. Larkin and Paul N. Wengert, of counsel.

Lawrence N. Minch, Washington, DC, with whom were Robert D. McCallum, Jr., Assistant Attorney General, and Director David M. Cohen, for defendant, Kimberly Y. Nash, United States Postal Service, of counsel.

Barry Roberts, Washington, DC, for defendant-intervenor.

## OPINION

FIRESTONE, Judge.

This case comes before the court after argument on a bid protest action alleging that the United States Postal Service ("USPS," "Postal Service," or "government") improperly awarded a national contract for travel management services to Omega Worldwide Travel, Inc. ("Omega"). Specifically, the protestor, CW Government Travel, Inc. ("Carlson") argues that: 1) Omega did not offer firm, fixed pricing as required by the solicitation; 2) the USPS conducted improper and unfair price negotiations with Omega; 3) the USPS impermissibly accepted Omega's non-conforming online booking product in contravention of the solicitation; and 4) the USPS failed to conduct a proper "best value" evaluation and misapplied the evaluation criteria set forth in the solicitation. After examining each of Carlson's complaints, the court rules that Carlson has failed to meet its burden for setting aside the contract award, and thus the USPS is entitled to summary judgment on the administrative record.

## I. STATEMENT OF FACTS

### A. The Solicitation

USPS travelers use approximately 140,000 airline tickets annually. The USPS has historically relied on several regional travel management suppliers to make employee reservations, change travel plans, and provide pricing information. After studying its travel spending patterns and the travel management services industry, the USPS determined that it could reduce costs and enhance quality and convenience by awarding a national contract to a sole supplier. In addition, the USPS determined that by promoting employee self-booking tools, the USPS could reduce the administrative costs associated with making air travel reservations.[1] Because of the varying expiration dates of the USPS regions' individual travel services contracts, this nationwide contract was to be phased-in over the course of approximately thirteen months.

#### 1. Solicitation Requirements

On June 19, 2001, the USPS issued Solicitation Number 072368–01–A–0187 ("solicitation") for travel management services.[2] The solicitation proposed awarding a firm-fixed price contract for a term of four years plus two three-year options, on the basis of "best value" to the USPS. The solicitation called for "travel services which shall include providing information, making and canceling reservations and issuing and canceling tickets for any type of travel transportation, lodging, car rental and other related travel services required by the Postal Service employees for official travel." It also specified that the Postal Service "anticipates implementation of a self-booking tool that will be used as the primary method for Postal travelers to make their reservations." The focus of this litigation is on the pricing requirements of the solicitation together with the

requirements for the online self-booking system.

The Statement of Work ("SOW") required that the successful bidder provide: 1) "traditional" travel reservation services, by phone, fax and e-mail; and 2) online self-booking services. The SOW stated in relevant part as follows:

A.4.3.1. RESERVATION SERVICES

Under this contract, the Postal Service may use FedTrip or similar program to allow its employees to self-book their travel plans. FedTrip is sponsored by the Department of Transportation and the use of FedTrip is available for government agencies.... The Postal Service desires that most postal employees will make their reservations via the self-booking process.... The Supplier must also have the capability to accept reservations from postal employees by email, fax and telephone.... The Supplier must be able to make reservations at its servicing office(s) when its Central Reservation System (CRS) system is not operating or when reservations must be made on an airline that does not subscribe to a CRS.

A.4.3.2. SELF BOOKING RESERVATION SYSTEM

The self-booking reservation system must be a product currently being used by other federal agencies for travel reservations. The self-booking engine provided must display government rate fares as well as the lowest commercial rates available. The product must be able to conduct a low fare search automatically for airline fares without additional action of the user. The product must have the capability to contain Postal Service travel policy and have clear access to GSA [General Services Administration] negotiated city pair and competitive airfares. Upon availability, the self-booking product should include linkage to Internet only fares.

---

1. The Postal Service reached this conclusion prior to issuing the solicitation: the USPS conducted a pilot test of one self-booking engine called "FedTrip" in the D.C. metropolitan area and mid-Atlantic region. During the pilot, the FedTrip pilot project was used by 60% to 70% of USPS travelers and received favorable feedback. (As discussed *infra*, FedTrip is just one of a number of internet-based online booking services that will be discussed in more detail throughout this opinion.)

2. Three amendments to the solicitation were subsequently issued: Amendment 01 was issued on June 22, 2001, Amendment 02 on July 3, 2001, and Amendment 03 on July 10, 2001.

## 2. Content of Proposals

The solicitation instructed offerors to separate their proposals into distinct sections for pricing and technical factors. For the pricing proposal section, the USPS provided a pricing schedule sheet and directed the offerors to provide as Item 001 the prices they would charge if they were allowed to retain all commissions, and as Item 002 their prices if required to pass the commissions back to the USPS.[3] The offerors were also instructed to use two pricing categories: 1) fees for airline transactions made using traditional services; and 2) fees for airline transactions made via self-booking. However, offerors were not limited to those categories, as the solicitation explicitly authorized offerors to "submit alternative pricing structures in response" to the solicitation.

## 3. Method of Evaluation

In the solicitation, the USPS instructed offerors that in making its "best value" determination, it considered the technical evaluation factors "more important than price." In descending order of importance, each offeror's technical proposal would be rated using four technical evaluation factors: 1) approach to the requirements of the SOW; 2) capability to perform the requirements of the solicitation; 3) current and past performance on contracts of similar size and scope; and 4) planned key personnel. After the technical proposals were evaluated, the full proposals would then be compared against one another. At that point, price would be considered in the evaluation, and in the source selection decision. The solicitation explained that, "To the extent that offers are considered comparable technically and otherwise, price to the

Postal Service will play a more significant role in the best value source selection decision."

## B. Proposals

The USPS received proposals from seven offerors in reply to the solicitation. Among those who replied, Omega, Carlson, Worldwide Travel Service, and Sato Travel were at the time incumbents holding contracts to supply travel management services within one or more of the USPS's regions.

## 1. Omega's Initial Proposal

Omega's technical proposal offered the USPS "the CRS system of your choice." The proposal specified that Omega had "all the major CRS (Sabre, Apollo/Galileo and Worldspan) in various locations throughout the U.S., Europe and Japan."[4]

> Our six global Customer Service Centers, including our 24–hour MegaCenter in Jacksonville, NC and our 24–hour Customer Service Center in Milwaukee all have multiple CRS. Sabre, Apollo/Galileo, and Worldspan are our primary systems because they have more domestic and international city pair listings, more car and hotel listings, and more fare listings.

In keeping with the solicitation, which called for the use of "FedTrip or a similar program," Omega identified FedTrip as a source product, but indicated that it believed "Trip Manager" to be a better system, primarily because the use of FedTrip by the USPS would require payment of an additional ***** fee per reservation.[5] The Trip Manager self-booking product, which is sup-

---

**3.** As discussed *infra*, at the time of the solicitation, airlines routinely provided commissions to travel agents for each ticket transaction.

**4.** A CRS—also called a global distribution system ("GDS")—is an internet-based system used by travel suppliers (primarily airlines, but also car rental companies and hotels) to store data centrally and make their fares available to travel agents and other customers. The two systems of concern in this matter are Sabre and Worldspan. At oral argument, plaintiff Carlson explained that Sabre is an independent company (which owns Travelocity.com, BTS, and GetThere.com), while Worldspan is run by airlines (it was created when Delta Air Lines, Northwest, and Trans

World Airlines agreed to combine their respective reservations into a unified CRS in 1990).

**5.** Travel self-booking systems such as FedTrip and Trip Manager are internet-based systems that pull the fares available to travel agents and customers from the CRS and GDS systems; they provide the interface between the user and the various central data systems. The additional fee for FedTrip comes from the fact that FedTrip is sponsored by the Department of Transportation ("DOT") and is made available for use by other federal agencies which enter into memoranda of understanding with DOT.

ported by the Worldspan CRS, is described by Omega in its proposal as follows:

> At the USPS' option, we will offer the FedTrip online booking product to the Government. Trip Manager and FedTrip are very similar products developed by the same company. However, Omega strives to mitigate costs for its clients wherever possible and for that reason we recommend Trip Manager because we believe that it offers the best value.

In accordance with the pricing requirements set forth in the solicitation, Omega identified its prices for two scenarios, first with Omega retaining all commissions, and second with Omega passing the commissions back to the Postal Service. In addition, within each scenario, Omega separated out the cost of "traditional services" and "self-booking reservations." Omega defined an online booking transaction as "one that does not involve Omega Personnel during the reservation process," and priced its online booking services using Trip Manager as the self-booking product.

Omega's price for traditional services, with Omega retaining the commissions, was ***** per transaction for years one and four, and ***** for years two and three. With respect to self-booking, Omega proposed to offer a rebate to the USPS of varying amounts, ranging from ***** depending upon the volume of self-booked travel. Omega's price for traditional services with all commissions passed through to the USPS was ***** for each of the four contract years. With respect to self-booking, Omega identified a range of *****, again depending upon volume. Omega indicated that if the USPS chose to use FedTrip, DOT's ***** fee would have to be added to each of the Trip Manager prices. In its proposal, Omega also identified two additional online reservation products that could potentially be used— "GetThere.com" and "Travelpoint/TravelCenter"—however Omega did not provide pricing for these products because it believed

that Trip Manager provided USPS with the best value.

### 2. Carlson's Initial Proposal

Carlson also submitted a pricing proposal in response to the solicitation. With respect to self-booking, Carlson offered "BTS," a government-dedicated self-booking tool, which uses Sabre's CRS. Carlson's proposal noted that the Sabre CRS was the only CRS that accesses Southwest Airlines ("Southwest"), one of the government's contract carriers on certain city-pair routes.[6] Carlson also offered a second self-booking product, "E2 Travel." Carlson's proposed price if retaining all commissions was between *****, depending on whether the reservations were made by phone, e-mail, or fax, and the year of the contract—prices increased from year one to four. With respect to self-booking fees, Carlson proposed that where it kept the commissions, prices would range between *****, depending upon the volume of self-booking. Carlson's prices for these services without retaining the commissions were as follows: 1) transactions made via traditional services ranged from *****, depending upon the type of service and contract year, and 2) self-booking services using BTS ranged from ***** per transaction, depending upon the volume of self-booking.[7]

### 3. Initial Confirmation of Omega's Pricing Proposal

On July 19, 2001, the USPS contacted Omega to confirm its pricing of ***** per transaction for years one and four of the contract, and ***** per transaction for years two and three of the contract for reservations made using traditional services, with Omega retaining all the commissions. That same day, Omega provided USPS with confirmation.

### C. Evaluations

The contracting officer ("CO"), Jeanne Castellano, established a six-person evalua-

---

6. Carlson specified that Southwest held contracts with the "GSA" for 7.5% of domestic city pairs in 2000, and 9.75% in 2001.

7. Prices using E2 Travel were higher—[*]***** through years one to four with commissions retained by Carlson, or ***** through years one to four with commissions passed through to the Postal Service.

tion committee, which jointly evaluated all the proposals during the week of July 23, 2001. First, the committee performed individual evaluations of each technical proposal. Next, the committee conducted online testing of each of the proposed self-booking products. During the course of the individual evaluations, the committee sought clarifications and held discussions with offerors concerning key issues raised by particular proposals. Finally, the evaluation committee performed a comparative evaluation of the complete proposals.

### 1. Clarifications and Discussions with Omega During the Week of July 23, 2001

On July 24, 2001, the CO again asked Omega to confirm its pricing proposal, which it did in writing that same day. In addition to verifying all previously-proposed pricing for Item 001 (Omega retaining all commissions), Omega offered an alternate pricing scheme of ***** per transaction for years one through four of the contract for reservations made using traditional services. Omega also supplied the USPS with additional details about the Trip Manager product:

> Some of the major corporate users of Trip Manager include Home Depot with 40% adoption, Federal Express with 60% adoption, Bell South, Dow Chemical, Humana and Federated Department Stores. Worldspan has over 1,000 companies using the product currently, the largest number of corporate licenses of any online booking product.

> Major government users include Department of Interior and the National Credit Union Association. Omega services all these accounts, providing Trip Manager to the largest number of government users. We currently process more than 1,000 Trip Manager bookings per month. For July to date, we have processed 1,082 Trip Manager tickets. In addition to the details provided in our proposal, Trip Manager has just unveiled a broad array of design innovations and other enhancements to be implemented in September.

In this letter, Omega also informed the USPS that it had a contract with Worldspan to support Trip Manager through February, 2006, and in response to a Postal Service request for updated financial statements, Omega confirmed that it was sending the information by Express Mail.

Next, on July 26, 2002, in response to a telephone inquiry from the CO, Omega provided additional written clarification of its proposal. Omega's letter specifically addressed the technical support it would provide for its travel information technology ("IT") and 24-hour emergency service. The letter also clarified that the special services desk for the USPS officers' program would be located in Fairfax, Virginia (the proposal said "Omega's headquarters" without giving its location), and gave more details concerning the services it would provide for USPS officers and "VIPs."

### 2. Clarifications and Discussions with Carlson During the Week of July 23, 2001

On July 25, 2001, Carlson was asked to provide financial information for its parent company, Carlson Wagonlit Travel, Inc., which would be providing the necessary operating capital for CW Government Travel, Inc. to perform the contract. According to the record, the Postal Service also requested additional information concerning Sabre's recent acquisition of GetThere, and how that new acquisition might negatively affect Sabre's commitment to providing continuous support to the BTS self-booking product it had proposed for the USPS contract. On July 27, 2001, a Carlson representative responded in writing with an assurance that, "Since the acquisition of GetThere by Sabre in October 2000, I have been able to observe the continued commitment of Sabre to the improvement of BTS, which has translated into increased booking efficiency and customer satisfaction of the Government clients who are currently using the product." However, Carlson did not provide any empirical data to support its and/or Sabre's continued commitment to enhancing BTS, and it disregarded the Postal Service's request for the financial statements of Carlson's parent.

### 3. Technical Review of the Proposals

The solicitation indicated that the technical merits of each proposal would be evaluated on the basis of four factors, which in descending order of importance were: 1) approach to the requirements of the statement of work; 2) capability to perform requirements of the solicitation; 3) current and past performance on contracts similar in size and scope; and 4) planned key personnel. During the week of July 23, 2001, the evaluation committee collectively reviewed the technical proposals. For each proposal, the committee assigned an adjectival rating for each of the four evaluation factors. After each proposal was assigned four adjectival ratings, and each factor's weight was taken into account, the committee gave the proposal an overall rating. The technical ratings received by the four leading offerors are summarized in the chart below.

|                             | Omega | Carlson | Adventure | SATO |
|-----------------------------|-------|---------|-----------|------|
| Approach to Requirements    | ***** | ***** | ***** | ***** |
| Supplier Capability         | ***** | ***** | ***** | ***** |
| Current and Past Performance | ***** | ***** | ***** | ***** |
| Key Personnel               | ***** | ***** | ***** | ***** |
| Overall Proposal Rating     | ***** | ***** | ***** | ***** |

Following the evaluation committee's week of meetings, the CO prepared a written technical evaluation of each offeror's proposal, summarizing the committee's basis for the technical scores awarded. In the two highest-weight categories, "Approach to Requirements" and "Supplier Capability," Omega received two ***** ratings, while Carlson received two ***** ratings.

These reports indicate that the evaluation committee scored Omega's technical proposal higher for a number of reasons, chiefly because Omega offered access to four online self-booking products, it provided pricing for both Trip Manager and FedTrip, and it would designate "VIP travel consultants" in its headquarters office in Fairfax, Virginia, to assist Postal Service officers, most of whom are located in Washington, DC. The evaluation committee also favorably cited Omega's utilization of multiple CRS systems and its ability to transfer data from one CRS to another in the event of a system failure. With regard to supplier capability, the evaluation committee believed that Omega had "adequate financial resources" and "presented a sound quality program" that addressed the automated ticketing process, provided a manual quality ticketing process, and included a process for addressing and documenting customer service-related issues.

The report also noted some weaknesses in Omega's proposal. With respect to the company's approach to requirements, the report stated: "It is known the current version of Trip Manager is lacking in some areas and is not as customer oriented as the FedTrip product. It is unknown if the proposed enhancements for Trip Manager will be in place by the time this contract is to be implemented. FedTrip was offered but Omega did not demonstrate an understanding of this product in its proposal." With respect to supplier capabilities, the report noted that the only weakness was that the "manual quality control checks on reservations could be excessive and result in increased labor costs." Despite these noted weaknesses, Omega received a ***** rating in both the "Approach to Requirements" and "Supplier Capability" categories.

The evaluation committee was also impressed with Carlson's technical proposal and capabilities. The committee noted that Carlson was "offering the online booking product BTS," and that BTS was "described as meeting the requirements for the online booking SOW." The evaluation committee also observed that Carlson, in conjunction with Sabre, had provided an acceptable contingency plan in the event of a CRS failure. The committee, however, also noted several weak-

nesses in Carlson's approach. It noted that the committee was uncertain as to Carlson's proposed use of subcontractors. It was concerned with self-booking, noting that the USPS would have to look to BTS personnel for help, not Carlson staff. The proposal did not indicate BTS's response time to inquiries from USPS travelers. And finally, the committee noted that Carlson had failed to include evidence of Sabre's continued commitment to support the BTS product in light of Sabre's recent acquisition of GetThere, a competing self-booking product.

Based upon its review of Carlson's capabilities, the evaluation committee determined that Carlson is dedicated exclusively to government travel and appears to have adequate financial backing, and cited favorably Carlson's "sound quality control program." The committee noted, however, that while the Carlson proposal appeared to involve new reservation call-in centers, Carlson had not supplied infrastructure plans for these new facilities, including staffing, IT, and telecommunications needs. Carlson received ***** ratings in both the "Approach to Requirements" and "Supplier Capabilities" categories.

In connection with the "Current and Past Performance" category, Omega received an ***** rating, and Carlson received an ***** rating. For Omega, the committee noted that it "has or has held contracts of comparable large dollar value and similar in nature to USPS requirements," and "as incumbent for three USPS existing contracts, only one has major issues, which was [sic] due primarily to Omega personnel problems." The committee also noted that Omega's proposed self-booking product, Trip Manager, was known to have problems, primarily related to Worldspan, Trip Manager's owner, failing to deliver enhancements in a timely manner. For Carlson, the committee noted that Carlson holds several contracts "of the same magnitude as this requirement." The committee, however, noted that Carlson did not provide references for "a single contract as large as the USPS," nor did the past performance information provided by the company indicate that internet-based training would be available to USPS travelers. Based on these

concerns, Carlson received an ***** rating in this category.

### 4. Comparative Evaluation and "Best Value" Determination

After soliciting information, holding discussions with the offerors, and evaluating the technical merits of the individual proposals, the evaluation committee performed a comparative evaluation of the proposals, adding in the pricing evaluation needed to make the "best value" determination. Clark Griffith, a member of the evaluation committee, developed a pricing model to enable the committee to compare the pricing of the various proposals using different assumptions about the volume of self-booking. He based the criteria factors upon the committee members' past knowledge of Postal Service travel history and the projected impact of adopting a new self-booking tool. The model also "incorporated data for all items stated in the pricing section of the solicitation, both for USPS retaining airline commissions and for the offeror retaining commissions." After each offeror's proposal was run through the model, the committee prepared a written report to summarize its comparative findings. The analyses generated with the pricing model were attached to the comparative evaluation, and the results were summarized as follows:

It was the consensus of this evaluation committee that Omega World Travel best meets the evaluation criteria for the technical proposal of [the solicitation]—both in the approach to the requirement and the overall capability of the supplier to fulfill the requirements of such a contract as stated in this solicitation for travel services. Upon completion of the evaluation of technical proposals, the pricing proposals were reviewed.... Omega World Travel provides the most competitive pricing for both the Trip Manager and FedTrip product.

The evaluation committee has reached the consensus that Omega World Travel provides the best value to the Postal Service considering the evaluation factors stated in the solicitation and price and price related factors. Omega is determined to be a

responsible supplier and award is recommended to Omega World Travel.

Omega's base prices were significantly lower than Carlson's, whether commissions were retained by the travel agency or passed through to USPS. Omega's pricing for self-booking was also significantly lower, regardless of whether Trip Manager or FedTrip was used. The pricing model showed that the Postal Service's costs would clearly be lower under the Omega proposal than under any of the other technically acceptable proposals. And even though the evaluation team recommended acceptance of Omega's pricing option in which Omega retained commissions—so that the USPS would receive Omega's proposed "rebates"—the CO determined that regardless of the pricing option selected, "Omega offered the best pricing we received."

Consistent with provisions of the USPS Purchasing Manual regulations concerning final discussions with the "apparently successful supplier," [8] the comparative evaluation states:

> Negotiations to refine minor elements will be continued with Omega World Travel and implemented as part of this contract when mutually agreed upon by both parties. The decision was made to wait until release of the enhancement to Trip Manager in September before determining which online booking product to implement.

### D. Final Omega Discussions and the Business Decision

After the CO and evaluation committee had made their "best value" determination and had identified Omega as the "apparently successful supplier," final stage discussions commenced in early August, 2001, with Omega. However, according to the CO's declaration filed with this court on July 11, 2002, in August 2001, the CO decided that "none of the offerors should be informed that I had made my award decision until I received headquarters approval to award the contract." CO's Decl. ¶ 45. The CO made this decision because even though she had authority under the Purchasing Manual to award the contract, she thought it appropriate to secure headquarters' approval, given the magnitude of the changes that would be required by the new contract in abandoning the regional approach to travel services in favor of a nationwide contract. *Id.* For this reason, while the CO was conducting discussions with Omega, she simultaneously sought final headquarters' approval of her decision to make the award to Omega.

#### 1. Final Stage Discussions with Omega

Following the evaluation process, the first time the CO contacted Omega was on August 6, 2001, to request clarifications regarding Omega's technical support plans for both Trip Manager and FedTrip, and whether these products would each support the 80,000 USPS users that would potentially need support under the contract. On August 8, 2001, Omega supplied specific information explaining how Omega planned to support Trip Manager and FedTrip. Between August 9 and September 24, Omega and USPS had four discussions. These discussions occurred in writing, and related to pricing terms.[9] Omega submitted its final proposal to USPS on September 24, 2001, and the next day, the CO submitted her business decision to headquarters recommending award of the contract to Omega. According to the CO, she did not contact Omega again to discuss any aspect of the solicitation between September 24, 2001, and March 5, 2002.

8. As discussed *infra* at part II.C., the USPS Purchasing Manual provides that following the "best value" determination, pre-award final stage discussions are allowed with the "apparently successful supplier," to allow the USPS to "reach the best arrangement with the Postal Service." *See* USPS Purchasing Manual § 4.25c(3).

9. For example, in mid-August, American/TWA and United Airlines reduced their commissions, and on August 22, Omega submitted its first revision of its prices—under the terms of the initial proposals, offerors were permitted to adjust their fixed prices in the event of airline commission changes. On September 5, Omega again submitted a revised pricing proposal, this time reducing its fees based on a review of its profit and overhead categories. On September 19, Carlson also submitted a revised pricing proposal. Between September 21 and September 24, the Postal Service continued negotiating pricing with Omega through an exchange of e-mails.

On March 5, 2002, the CO sent an e-mail to Omega requesting once again that the company confirm the pricing it had offered to USPS in its September 24, 2001 final proposal. Omega confirmed this pricing, and the CO informed Omega on March 11, 2002, that, pending "review and approval" of updated financial statements, USPS was recommending Omega as the source supplier. In the March 11, 2002 e-mail, the CO included a proposed contract rollout schedule for Omega to begin providing traditional travel services in the USPS regions, and indicated that Trip Manager would be rolled out once certification of the system was completed.

Between March 14, 2002, and March 18, 2002—after USPS had communicated its decision to Omega—most airlines completely eliminated commissions to travel agents for tickets sold in the United States for domestic and international travel. Omega informed USPS that for reservations made using traditional services with commissions passed through to USPS, it was now offering a rate of $17.00 per transaction and rates ranging from $9.50 to $4.50 per transaction for Trip Manager self-booking (depending on the percentage of online transactions) for all four years of the contract. At the CO's request, Omega elaborated on the pricing offered and agreed that it would "return air commissions [if any], and trackable hotel and car commissions to USPS." On March 29, 2002, the Postal Service contacted Omega to seek clarification of a provision that concerned the USPS officers program and delivery of airline tickets. That day, USPS also requested that Omega provide actual air sales data, so that the USPS might evaluate whether the price increases sought by Omega between March 14 and 18, 2001—to compensate for the loss of commissions—was justified. Between March 29 and April 9, 2002, Omega supplied the information requested. Although the USPS countered Omega's terms in an April 12, 2002 letter,[10] the March 14 pricing was incorporated into the terms of the contract that was awarded by letter on April 15, 2002. The letter informed Omega that, "The revised pricing of $17.00 for tradi-

tional services and $9.50–$4.50 for Trip Manager bookings has been accepted." The same day, the Postal Service notified the unsuccessful offerors by letter that the contract had been awarded to Omega. In response, Carlson requested and received a debriefing.

### 2. Headquarters' Approval of the Business Decision

As noted above, while the CO was negotiating with Omega during August and September 2001, the CO submitted her business decision to headquarters for comment and approval. The CO signed the business decision on September 25, 2001. The business decision discussed the various proposals and stated in summary:

> It is our recommendation that Omega World Travel be awarded the contract to provide travel management services to the Postal Service on a national level. The contract will be implemented in stages as existing travel contracts expire and with mutual agreement between the supplier and USPS. The team recommends that the actual selection of the online booking product to be implemented be negotiated with Omega World Travel at a date soon after award. . . . Delaying the selection of the online booking product will allow for better comparison of the products offered and allow for review of proposed enhancements to the Trip Manager online product scheduled to be upgraded in October 2001.

On October 2, 2001, Keith Strange, USPS Vice President for Purchasing and Materials, approved the CO's decision to award the contract to Omega. However, he conditioned his approval on the Chief Financial Officer's briefing and concurrence. The approval from the USPS Chief Financial Officer, Richard Strasser, did not arrive until March 7, 2002.

### E. Proceedings in This Court

Plaintiff Carlson filed the present action on May 21, 2002, seeking injunctive and declara-

---

**10.** In its letter, the USPS proposed ***** for traditional travel services for years one though four of the contract with commissions returned

to the Postal Service, and a range from ***** for Trip Manager bookings.

tory relief. Omega was granted permission to intervene on May 28, 2002. On June 14, 2002, Carlson filed an amended complaint following review of the administrative record, and on June 25, 2002, the government moved for summary judgment on the administrative record. Omega filed its brief in support of the government on the following day. The court allowed the government to supplement the administrative record with the declaration of the CO, Jeanne Castellano, on July 11, 2002. Carlson cross-moved for summary judgment on the administrative record on July 23, 2002. At the conclusion of briefing, oral argument was held on August 9, 2002.

## II. DISCUSSION

### A. Scope and Standard of Review

■■■ Review of post-award bid protest actions is based on the administrative record developed before the contracting agency. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001); 28 U.S.C. § 1491(b)(1) (1994 & Supp.2002). The court's role is to determine whether the procuring agency's conduct was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 28 U.S.C. § 1491(b)(4). Judicial review of agency procurement decisions is therefore extremely limited. *Cincom Systems, Inc. v. United States*, 37 Fed.Cl. 663, 671 (1997); *CACI Field Services, Inc. v. United States*, 13 Cl.Ct. 718, 725 (1987). Under the "arbitrary and capricious" standard, an award "may be set aside only if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332. As the *Impresa* court explained:

> When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. Accordingly, the test for reviewing courts is to determine whether "the CO provided a coherent and reasonable explanation of its exercise of discretion," and the "disappointed bidder bears a 'heavy burden' of showing that the award decision

'had no rational basis.'" When a challenge is brought on the second ground, the disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations."

*Id.* at 1332–33 (internal citations omitted).

Accordingly, the aggrieved party faces a heavy burden. The reviewing court may not substitute its judgment for that of the agency. *IMS Servs., Inc. v. United States*, 33 Fed.Cl. 167, 179 (1995); *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983). The question before the court is not whether a contracting officer's decision was right or wrong; instead, the court "must determine whether that decision was the result of a considered process, rather than an arbitrary and capricious choice based on factors lacking any intrinsic rational basis or relationship to the questions at issue." *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1277 (5th Cir.1978). Technical rating decisions are the "minutiae of the procurement process ... which involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir.1996).

### B. Both Omega's Offer and the Final Contract Contain Firm, Fixed Pricing

■■■ Carlson argues that the USPS impermissibly considered Omega's offer, alleging that Omega's offer was not firm or fixed in contravention of the solicitation. Carlson argues that Omega's pre-award price proposal was not firm or fixed for several reasons. First, Carlson complains that Omega stated that its prices were "based upon current industry commission levels and caps, as well as third party vendor fees paid by Omega, as of 9/23/01. Should these change we will reserve the right to an equitable adjustment." Carlson argues that this statement made "all of Omega's transaction prices ... subject to an unspecified adjustment," and thus Omega's price proposals were neither firm nor fixed.

Second, Carlson argues that Omega's on-line self-booking fees were not firm or fixed because Omega stated in its offer that the

online fee would only be available "if the online transaction does not involve Omega personnel during the reservation process." Carlson argues that Omega's restriction fails to establish a firm or fixed self-booking fee, because, according to Carlson, "Depending upon the degree of automation provided by an online booking product, and a contractor's internal interface with [the online product], it may be that virtually every online transaction requires involvement by Omega personnel." Carlson notes that no other offeror placed this restriction on its pricing.

Third, Carlson challenges the USPS's acceptance of Omega's open-ended request for the additional fees required should it have to use FedTrip, instead of Trip Manager. Carlson argues that Omega did not cap the FedTrip fee and thus left the amount open, not firm or fixed. Carlson contends that all other offerors were required to account for third party vendor fees in making their firm and fixed price proposals, and that if it too had been allowed to leave open the possibility of recouping fee changes by its vendors, its price would undoubtedly have been substantially lower.

The government counters that the USPS did not waive the firm and fixed price requirements of the solicitation in awarding the contract to Omega. First, as a general matter, the government notes that the focus of Carlson's arguments is not on Omega's initial offer, but instead focuses on correspondence between Omega and the USPS *after* the CO's tentative selection of Omega, as authorized by the USPS Purchasing Manual. Turning to the specifics of Carlson's allegations, the government demonstrates that all offerors were permitted to incorporate an adjustment factor in Item 001 pricing to compensate for changes in commission levels, and not only Omega, but also Carlson and other offerors did so too. Further, according to the government, the correspondence about which Carlson complains was triggered when the USPS endeavored to finalize *only* Omega's Item 001 pricing, reflecting prices with com-

missions going to the supplier, Omega. Contrary to Carlson's assertions, the government shows that Omega's September 5, 2001, and March 14, 2002 letters both make clear that "[a]ll other previously proposed pricing and costs remain unchanged," including the Item 002 prices.[11] Moreover, the government states that the issue is moot, because the airlines have now eliminated all commissions, making all Item 001 prices irrelevant.

Second, according to the government, Omega's proposal does contain firm, fixed pricing for the alternative online booking product FedTrip. Omega's proposal clearly states: "If FedTrip is used, we will charge an additional ***** per transaction...." While the government does not dispute that in subsequent correspondence between Omega and the CO, Omega confirmed that "use of FedTrip would incur additional fees as required by DOT/TRX agreement," the government states that this was simply an acknowledgment of the transaction fee stated in Omega's proposal, and *not* a request to change it. The USPS contends that there is no indication in the record that either party intended this language to release Omega from the commitment to limit payment to only the ***** identified in its proposal.

Finally, the government disputes Carlson's assertion that the contract's definition of an online transaction as "one that does not involve Omega personnel during the reservation process" makes the savings from Omega's lower-priced online booking service "illusory." According to the government, the provision of the contract that Carlson quotes is simply a restatement of the definition of an online booking transaction that was included in Omega's original proposal. The government contends that the requirement that the USPS pay for traditional services when its travelers involve Omega's travel professionals to book the transaction is reasonable, and in no way implies that "virtually every online transaction" will trigger assistance and thus the higher fee.

---

11. Similarly, according to the government, the comments of the USPS pricing analyst to which Carlson refers in its motion were made in connection with the revision of Omega's Item 001 pricing that was triggered by the August 2001 change in airline commission levels, and thus have no relevance to any issue before this court. The analyst was questioning whether the adjustment factor stated in Omega's proposal was justified by Omega's actual costs.

On balance, the court agrees with the government. First, Carlson's objections to Omega's post-September price offers do not provide a basis for setting aside the contract award. It is clear from the record that Omega's initial offer was firm and fixed. From the time the CO identified Omega as the "best value" choice in August, until the final contract was signed, Omega and the USPS were engaged in negotiations. Omega's initial offer had firm, fixed price terms, as did the final contract. Moreover, Omega's concerns about airlines' commission reductions in September did not affect the prices it offered for traditional and online services where the commissions were not retained by the supplier. The court agrees with the USPS that a careful reading of Omega's September 2001 and March 2002 letters reveals that they applied only to Item 001 pricing. Further, as the USPS correctly notes, the Item 001 pricing became moot once the airline commissions were eliminated. Ultimately, Item 001 pricing for all offerors became irrelevant.

The court also agrees with the government that Omega's prices are not open-ended because if it is required to use FedTrip, it is entitled to the ***** DOT/TRX fee identified in its offer. However, it must be noted that this issue is now also moot, given the successful implementation of Trip Manager by Omega and the USPS. Trip Manager has been successfully rolled out in a number of USPS regions already, and more regions will come online over the course of the next few months.

Finally, Carlson's concerns about Omega's definition of the term "online transaction" do not warrant setting aside the USPS award. The solicitation required each offeror to provide technical support for whichever CNS/self-booking engine combination it chose to propose, and each proposal was different in this respect. What Carlson is alleging is that Omega has mislead the USPS in that there will be a human involved in "virtually every" ticket transaction, whether it is initiated electronically or via one of the traditional methods, and therefore the USPS has evaluated Omega improperly. Carlson has apparently made this argument by leaping to the conclusion that the definition contained in Omega's proposal—that the online fee will only be available "if the online transaction does not involve Omega personnel during the reservation process"—means that *every* time a USPS traveler needs with the Trip Manager program, that traveler will incur the traditional travel booking fees instead of online fees. However, based on information in the record, and given the representations made by the government at oral argument, this is simply not the case.

Like Carlson, Omega intends to rely on IT specialists affiliated with its chosen CRS and self-booking engine companies to handle technical difficulties that USPS travelers encounter during the self-booking process. In its proposal, Carlson indicated its intention to rely upon a BTS help desk, with backup provide by Sabre's GetThere online help desk; similarly, Omega's own IT help desk will work in conjunction with Worldspan to address users' Trip Manager problems. The government and Omega further elaborated at oral argument that Omega has a completely separate IT help department apart from its travel help desk, meaning that USPS travelers with computer issues while making reservations need not speak to an Omega travel agent and as a result incur traditional travel fees. While the language used in Omega's proposal may be somewhat ambiguous, a review of the entire record—in particular, Omega's August 8, 2001 letter sent to the CO in response to her pointed questions about customer support—demonstrates that Omega will provide IT support without triggering the traditional fee.

In such circumstances, Carlson has failed to identify a basis for setting aside the contract award on the grounds that Omega's offer failed to provide for firm or fixed prices. While the discussions between Omega and the USPS that occurred following the CO's naming Omega the "apparently successful supplier" may have led to some negotiation uncertainties, Omega's initial offer was firm and fixed, and the final contract provides firm and fixed prices as well.

### C. The Postal Service's Communications with Omega Were Proper

■ At the core of Carlson's complaint is its contention that following the "best value"

determination, the CO only held discussions with Omega, and that this was improper. Carlson argues that where, as here, headquarters' approval was needed before the final contract award could be made, the CO could not begin "final stage discussions" until she received headquarters' approval, which eventually happened in October 2001. Carlson argues that all of the potential awardees should have been given the same opportunities to modify their price proposals, and that the discussions with Omega were plainly improper and outside the bounds of the USPS Purchasing Manual.

In response, the government relies on § 4.2.5.c.3(d) of the Purchasing Manual, which it argues allows the CO broad discretion to negotiate for the best price once the CO has identified the "apparently successful supplier." The relevant provision of the Purchasing Manual—governing communications with suppliers after the comparative evaluation is complete and the "apparently successful supplier" has been identified—is found at § 4.2.5.c.3(d):

> The final stage of discussions is reaching an agreement on the contract's terms and conditions with the apparently successful supplier. The goal of this stage is to reach the best business arrangement for the Postal Service, and during this stage any remaining issues should be addressed and revised.

Only if "the extent of these issues may reasonably be viewed as changing the rationale for determining the best value to the Postal Service," must the CO consider reopening discussions with other suppliers. The government argues that because the final stage discussions with Omega never resulted in the USPS changing its rationale for determining that Omega's offer provided the best value to

the USPS, those discussions were in accordance with the Purchasing Manual rules.[12]

After carefully reviewing the record and the applicable regulations, the court must agree with the government that Carlson's arguments regarding the nature and scope of the CO's discussions with Omega do not provide a basis for overturning the award. The government correctly notes that the applicable regulation allows the USPS to engage in extensive price negotiations with the "apparently successful supplier" before a "final award decision" has been made. Carlson has failed to identify where the USPS Purchasing Manual requires that the CO obtain headquarter's approval before engaging in final stage talks, even where headquarter's approval is required.[13] The Manual gives the CO "responsibil[ity] for the conduct of discussions," and allows final stage discussions once the "apparently successful supplier is identified," following the "best value" evaluation. Here, the CO's actions fit squarely within the authority provided.

Furthermore, Carlson fails to identify how the outcome of those discussions resulted in any changes to either the substance of Omega's initial proposal or in the USPS's requirements pricing.[14] As the CO explained in her declaration:

> Despite Omega's [March 2002] revised pricing, Omega's pricing was lower than the pricing of the other technically acceptable proposals.... The events that precipitated the revised pricing affected all travel management service suppliers, and the Postal Service prior pricing evaluations had already compared pricing both with commissions retained by the travel agent and with commissions passed through to the Postal Service.... The upward revision in rates that Omega ultimately negoti-

12. § 4.2.5.3(d) also bars the USPS from making changes to the USPS's requirements or the supplier's proposal which, if made before supplier selection, would have affected the basis for that selection. Carlson argues that contrary to this prohibition, the CO permitted Omega to revise a non-compliant proposal and waived solicitation requirements. As discussed throughout, the court finds Carlson's contentions are not supported.

13. As discussed *supra*, part I.D., the CO had authority to make the contract award herself, however she used her discretion to seek headquarters' approval given the nationwide scope of this major contract.

14. As discussed *infra*, the court does not agree that the solicitation ever required the offerors to include online booking for either Southwest or JetBlue, or that these negotiations led the USPS to waive the solicitation requirements in that regard.

ated with the Postal Service in response to the airlines' canceling commissions in March, 2002, simply made the rates with Omega keeping the commissions, the same as the rates with commissions passed through to the Postal Service.

CO's Decl. ¶ 57 (internal citations omitted). There is no question that Omega's transaction fees, with commissions passed through to the Postal Service, remained significantly lower than the best offer made by Carlson or any other offeror, even after Omega made its March–April 2002 revisions. Thus, these revisions cannot reasonably be viewed as having changed the rationale for the CO's "best value" determination.

Carlson's argument that it was improper for the CO to disclose to Omega the amount that the Postal Service was willing to pay per transaction, or to seek a revised pricing proposal from Omega under § 4.2.5.c.3(d) of the Purchasing Manual is also not supported. The CO is directed by the Purchasing Manual, to seek the "best business arrangement" for the Postal Service during the final stage of the procurement process. This must include securing the best price from the selected supplier. Accordingly, the CO's counter-proposal sought lower pricing than that stated in Omega's proposal, once proposal prices were adjusted for the change in airline commission levels. Yet even though the CO proffered certain proposed prices during the negotiations with Omega, she never informed Omega of any final or "bottom-line" pricing that the Postal Service was willing to accept. In fact, the record reveals that Omega made a counter-proposal to the Postal Service's final negotiating letter dated April 12, 2002, and Omega's counter contained prices that were higher than those proposed by the USPS. Yet in the end, Omega's final offer was accepted by the USPS.[15]

In sum, Carlson has not shown how the USPS's final stage discussions with Omega violated the USPS's Purchasing Manual. Accordingly, the discussions do not provide a

basis for overturning the USPS's award to Omega.

## D. The Postal Service Did Not Waive Any Solicitation Requirements

■ Carlson also strongly argues that the USPS's decision to award the contract to Omega violated the terms of the solicitation on the grounds that the SOW required a self-booking product that would provide online access to Southwest fares, and that Omega's online system Trip Manager does not include Southwest fares. In making this allegation, Carlson relies on the following requirement from the SOW:

> The self-booking reservation system must be a product currently being used by other federal agencies for travel reservations. The self-booking engine provided must display government rate fares as well as the lowest commercial rates available. The product must be able to conduct a low fare search automatically for airline fares without additional action of the user. The product must have the capability to contain Postal Service travel policy and have clear access to GSA negotiated city pair and competitive airfares. Upon availability, the self-booking product should include linkage to Internet only fares.

Carlson argues that in order to meet this SOW criteria, the offeror had to provide an online product that displays "all government and commercial rates." It is not disputed that Trip Manager does not allow USPS travelers online access to government rates on Southwest, or that Southwest currently holds a number of government city-pair contracts. Carlson therefore argues that the USPS's decision to award the contract to Omega, in such circumstances, was arbitrary, capricious, and not in accordance with law.

The government counters that the solicitation did not require the offerors to provide a product that displays *all* government airfares, and that it is unreasonable for Carlson to interpret the SOW as imposing such a requirement. Because the SOW does not

---

**15.** As noted above, the negotiations to which Carlson objects concerned pricing with commissions being retained by Omega. These discussions became irrelevant once airlines ceased to provide commissions and the final contract only provides for rates with all commissions being passed through to the USPS.

include the word "all," the USPS was reasonable in concluding that Omega's Trip Manager could meet the online service requirements. The government further argues that if the USPS had wanted to ensure that Southwest rates be made available, it would have had to dictate that *only* those online products which interface with Sabre would be acceptable, since Sabre is the only GDS or CRS with access to Southwest's fares. However instead, the solicitation simply required the offerors to propose an online product with "access to a GDS." In addition, the government notes that the solicitation provided, with respect to "reservation services," that the offeror would have to offer reservations through its "servicing office(s) when . . . reservations must be made on an airline that does not subscribe to a CRS." According to the CO, this validates the interpretation that access to *all* airlines' fares is not required under the SOW:

> Plainly, the solicitation did not require that the self-booking system link to a CRS that provided access to *all* CRS systems or a particular airline carrier, since it requires the supplier to be able to make reservations at its servicing offices when its CRS was not operating or when reservations were made on an airline that did not subscribe to a CRS.

CO's Dec. ¶ 26 (internal citations omitted). Based on these facts, the USPS concludes that the CO's conclusion that Omega's online capabilities conformed to the solicitation cannot be second-guessed by the court.

█ The court again agrees with the government. It is well-settled that government agencies such as the USPS are given wide discretion to determine whether an offer meets the technical requirements of a solicitation. *See E.W. Bliss*, 77 F.3d at 449. Where, as here, the SOW did not mandate the use of the sole CRS system with access to Southwest's government fares, the court cannot now read that requirement into the solicitation. Indeed, the solicitation express-

ly recognized that some airlines may not subscribe to a given CRS, and therefore required the successful offeror to provide tickets for those airlines through its service centers. It is the court's understanding, based on the representations of the parties, that no airline is *required* to make any or all of its fares available through any particular CRS/GDS, and therefore, the USPS could never require that all airfares be available to a travel agent using a particular CRS/GDS system. It is not disputed that Postal Service travelers can book a Southwest flight through an Omega call center, and that is all the solicitation requires.[16]

Furthermore, Carlson's assertion that the savings anticipated from Omega's low rates for online booking are illusory, since Omega's online booking product cannot access Southwest fares, does not provide the court with a basis for reversing the USPS's decision. The CO's declaration specifically addresses this contention:

> The pricing analyses did not take into account that Carlson's self-booking would provide access to Southwest Airlines and would therefore possibly lead to a higher level of usage. This was not necessary, since from a comparison of the proposals it was apparent that when commissions are passed through to the Postal Service it was just as cost-effective to telephone Omega's reservation desk to book a Southwest fare at ***** per transaction, as to self-book a Southwest fare using BTS at ***** per transaction (depending on the self-booking adoption rates) from Carlson.

CO's Decl. ¶ 35. As such, even if the government were to agree with Carlson, it would not lead this court to question the USPS's judgment in selecting Omega over Carlson.

In sum, the record supports the government's contention that the CO made a rational decision to accept the Omega proposal, even though Omega's proposal did not include the ability to access Southwest fares online.[17]

16. In the version of Trip Manager that is being implemented by Omega at this time, Trip Manager indicates when Southwest holds the government city pair contract and directs the user to telephone the travel agency. CO's Decl. ¶ 50.

17. Carlson asserts that "requiring a significant number of USPS users to rely on traditional booking methods" to access Southwest or Jet Blue "is inconsistent with the Solicitation requirements to maximize the usage of online

### E. Omega's Planned Rollout of Trip Manager Does Not Violate Any Solicitation Requirement

■ Carlson further argues that the USPS's plan to "pilot" Trip Manager in one postal region before its gradual implementation nationwide resulted in a waiver of the solicitation requirements by the USPS. Carlson contends that the solicitation required the supplier to be prepared to offer both traditional and online services upon award, and that the phase-in contained in the solicitation refers only to the supplier's gradual takeover of the USPS regions upon the expiration of the preceding contracts. Carlson asserts that the solicitation did not allow for a phase-in of the online system, but that if it had, Carlson and other offerors would have substantially reduced their offer prices. Carlson therefore concludes that the CO's decision was prejudicial.

The government disputes that the decision to roll out Trip Manager in stages is in any way inconsistent with the solicitation. While it is true that the solicitation dealt primarily with phasing in the new contract as regional contracts expired, the government contends that "the decision to phase in the self-booking product was unrelated to the product selected," and that the CO acted in accordance with the contract when she recommended in her business decision that the USPS phase in the new technology gradually. CO's Decl. ¶¶ 8–9, 38, 50. According to the government, this decision was standard operating procedure for the USPS, a "typical Postal Service approach to new equipment or software." Furthermore, the government notes that the USPS was interested in evaluating the planned enhancements to Trip Manager before committing to its use over FedTrip, further justifying the self-booking system rollout.

Again, the court must agree with the government. The record demonstrates that the decision to "pilot" Trip Manager was reasonable and proper under the solicitation. The decision to "pilot the Trip Manager product

in the Southeast Area" was apparently based on the fact that the Southeast Region would be the first USPS regional contract to expire. Contrary to Carlson's contentions, the CO's statement that the Postal Service would "pilot" Trip Manager did not indicate "USPS' deep concern over Omega's performance capability," as Carlson asserts, but was instead merely a matter of USPS logistics. While the USPS indicated that it would require Omega to switch to FedTrip in the event Trip Manager did not work, the Postal Service was interested first evaluating the enhancements being made to Trip Manager, in hopes of getting the best value for the Postal Service. The CO stated in her business decision: "Delaying the selection of the online booking product will allow for better comparison of the products offered and allow for a review of proposed enhancements to the Trip Manager online product scheduled to be upgraded on October, 2001."

Additionally, the decision to roll out the online booking portion of the contract was not inconsistent with the SOW. It is undisputed that the nationwide contract will be rolled out in each USPS region as the incumbent contracts expired; this timeline was provided to the bidders in section A.1. of the SOW. But in addition to that already-established rollout schedule, the USPS clearly contemplated possibly needing another rollout, the rollout that would be required for the wholesale implementation of a new nationwide travel program, including online booking. Section A.4.23. of the SOW, "Transition Requirements," dictated the following:

> The Supplier shall furnish phase-in training to Postal organizations transitioning to the Postal Service national contract. The Supplier shall exercise its best efforts to affect a cooperative, orderly, and seamless transition from existing Postal Travel Management Center contracts to the national Postal Travel Management Contract. . . . The Supplier shall submit in its

---

booking." The passages in the solicitation to which Carlson cites, however, do not state contractor requirements, but rather Postal Service goals. As the purchase plan preceding the solicitation makes clear, the Postal Service did not

wish to maximize the usage of online booking for its own sake, but as a means of "cost avoidance and cost containment." As such, it was to be evaluated as just one of the contract's many technical requirements.

proposal a plan and time line to implement the Area and HQ offices.

This provision of the SOW clearly anticipates something more complicated than, "the supplier shall begin providing both traditional and online booking products on day one of this contract in each postal region," which is how Carlson is asking the court to read the solicitation.

. As further explained in section B.2.1. of the SOW, each bidder was required to include details regarding its "implementation plan ... and the timeline to phase in the different Areas of the Postal Service including proposed training." This is consistent with the government's statements at oral argument, where it explained, "The areas currently on the Omega contract to whom we have not yet rolled [online booking] out due to logistics and time frame because training schedules have not yet been set are Eastern, Northeast, New York Metro and Southeast." As stated by the CO in her declaration:

> From very early on, the Postal Service considered that phase-in training to employees and phasing-out the existing contracts, which had different expiration dates, would be important to successfully transitioning to a national contract. The decision to phase-in use of the self-booking product was unrelated to deciding which self-booking product would be utilized.

CO's Decl. ¶ 38.

Because the record shows that the decision to phase in Omega's online booking tool was not precipitated by any concern of Omega's, or a USPS concern regarding Trip Manager, such a decision would probably have been made regardless of which bidder was ultimately successful. The court agrees that based upon a review of the record, the decision was indeed "unrelated" to the selection of either Omega or Trip Manager as the winning bidder and product. In such circumstances, the court finds that the USPS's decision to test Trip Manager and to gradually roll out the chosen self-booking product is not related to deficiencies in Omega's proposal, but is both reasonable and consistent with the solicitation.

### F. The Proposals Were Reasonably Evaluated in Accordance with the Criteria Stated in the Solicitation

Carlson's final arguments relate to its belief that the USPS did not evaluate the proposals in accordance with the solicitation criteria, and that the USPS made numerous errors in its evaluation thereby rendering it invalid. Carlson contends that if the USPS had performed a proper comparative analysis of the online booking products offered by Carlson and Omega, the USPS would have discovered that Trip Manager did not offer the same benefits as those offered by Carlson's BTS product. Carlson also alleges that the USPS based Carlson's lower ratings on various factual mistakes made by the USPS in reading its proposal.

The government counters that Carlson's objections to the USPS's evaluation process and the ratings do not provide a basis for setting aside the procurement decision. According to the government, Carlson fails to appreciate the fact that the CO was charged with comparing more than just the offerors' self-booking products: the CO was required to compare the full range of travel services required by the solicitation. In addition, while the USPS admits to some minor errors in the evaluation process, it contends that none rise to the level of a prejudicial error warranting reversal of the award.

Based on the court's review of each of Carlson's complaints related to the evaluation process and outcome, the court finds that Carlson has failed to demonstrate that the USPS was arbitrary and capricious, or that it violated the Purchasing Manual in making its "best value" determination.

The solicitation indicated that the technical merits of each proposal would be evaluated upon the basis of four factors, which in descending order of importance were: 1) approach to requirements of the SOW; 2) capability to perform the requirements of the solicitation; 3) current and past performance on contracts similar in size and scope; and 4) planned key personnel. The record clearly shows that the evaluation committee jointly reviewed all of the technical proposals. Thereafter, the committee gave each proposal an adjectival rating for each of the four

evaluation factors, then based on those ratings, they adjusted the scores to account for the relative weight afforded to each factor and assigned each proposal an overall rating. Applying this methodology, the evaluation committee gave the Omega technical proposal the highest rating.

In this connection, Carlson's contention that the committee did not engage in a sufficiently rigorous comparison of the proposed online booking systems is not supported by the record. The record shows that the members of the evaluation committee individually went online to evaluate each of the proposed self-booking products in order to determine whether each product would fulfill the terms of the solicitation and be user-friendly. The committee determined that all four products satisfied the requirements of the solicitation. The court cannot now second-guess that determination. *See E.W. Bliss,* 77 F.3d at 449. Given the fact that the evaluation committee was composed of six USPS professionals with historical experience regarding the travel needs of the Postal Service, including the CO who had direct experience with the three incumbent offerors who made bids on this contract—Omega, Carlson, and Sato—the court intends to allow the USPS evaluation committee the widest discretion in its evaluation of bids. *Grumman Data Sys. Corp. v. Widnall,* 15 F.3d 1044, 1046 (Fed.Cir.1994) ("Government agencies are entrusted with a good deal of discretion in making procurement decisions.").

Ultimately, the CO determined that Omega had the better proposal because it offered, *inter alia,* better call centers, 24–hour emergency service from Omega's Milwaukee service center, a plan to staff the contract with travel consultants who would be 100% dedicated to the Postal Service account, a VIP program, and contingency plans in the event of system failures, including its utilization of multiple CRS systems and its ability to transfer data between them. The record simply does not support Carlson's contention that the evaluation process was irrational.

In such circumstances, Carlson's contention that a detailed "best value" analysis

must balance the pros and cons of each proposal is not supported. Having concluded that Omega offered the best technical proposal and the best price, a more detailed "best value" analysis was not required. Nor do Carlson's arguments regarding the fact that the USPS made some mistakes in the evaluation alter the court's conclusion. In particular, Carlson argues that the CO arbitrarily downgraded Carlson in the "Supplier Capability" category because it failed to provide USPS with adequate financial data regarding its parent company, and in the "Past Performance" category because Carlson failed to identify comparably large contracts. In both instances, Carlson argues that the USPS was simply wrong. While this may, in fact, be true, the court cannot engage in the re-evaluation procedure Carlson proposes. The court's task is not to correct evaluation mistakes, *Grumman,* 15 F.3d at 1048 ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement."), but to determine whether the conclusions reached by the USPS were wholly unreasonable given the undisputed facts on the record. *E.W. Bliss,* 77 F.3d at 449 (holding that a protester must show that the government's error in a bid evaluation was so significant that the government had "no reasonable basis" for its "best value" determination). *See also Impresa,* 238 F.3d at 1332–33. For example, even if the USPS corrected the mistakes that Carlson has alleged, the court cannot conclude that it would necessarily change either Carlson's individual ratings or the committee's overall rating of Carlson's technical proposal. The committee's biggest concern with Carlson's approach to the solicitation requirements was its reliance on BTS, which the USPS believed might not be supported by Sabre following Sabre's acquisition of a newer product. The USPS noted that while Carlson stated its belief that Sabre would continue to support BTS, Carlson did not provide any assurances from Sabre. The CO states in her declaration that this concern persisted: "our underlying concern [was] that there was instability surrounding the BTS product." CO's Decl. ¶ 41.[18] In such

---

18. As discussed *supra,* part I.C.2., the USPS's

concern stemmed from the fact that Carlson's

circumstances, the court cannot find Carlson's rating irrational.

Similarly, the court has no basis to find that Carlson deserves a higher rating than Omega in the second most important category, "Supplier Capability." Carlson's proposal was rated ***** in this category, and not simply ***** in part because the USPS believed that Carlson had not furnished financial information about its parent company to the evaluation committee and in part due to the USPS's concerns about Carlson's commitment to staffing its service call centers. It now appears that Carlson did supply financial information regarding its parent to the USPS, however, Carlson does not address the questions raised about the adequacy of staffing for Carlson's reservation call-in centers. In any event, the court will not substitute its judgment of for the USPS's.

Finally, Carlson objects to its past performance rating on the grounds that the USPS failed to consider comparable large contracts it had with the Army, although it admittedly failed to identify references for those contracts to the USPS—information about the contracts was apparently under a separate heading within its proposal. Carlson argues that the USPS "should have known" on its own to contact references for those contracts, and that the USPS acted arbitrarily in failing to do so simply because the information wasn't labeled the way the government had requested. However, whether the USPS should be faulted for failing to contact references that were not properly identified by Carlson is not obvious to the court. Ultimately, it was Carlson's task to make its best case for past performance, which it failed to do. Moreover, where, as here, both Omega and Carlson were known quantities to the USPS, the court will not second-guess the USPS's past performance ratings. *E.W. Bliss*, 77 F.3d at 449.

## III. CONCLUSION

In sum, Carlson has failed to meet its burden for overturning the contract award.

While the USPS evaluation may not have been perfect, perfection is not required. The record shows that the USPS followed a rigorous evaluation process, and as a result of discussions with the highest-rated bidder, the CO was able to secure a contract that the USPS is confident provides the best value to the Postal Service. Carlson has not presented the court with a basis for second-guessing that conclusion. Accordingly, the government's motion for summary judgment on the administrative record is **GRANTED,** and plaintiff's cross-motion for judgment on the administrative record is **DENIED.** Each party to bear its own costs.

---

proposal relied on the Sabre CRS and BTS self-booking product, and Sabre had recently acquired a competing self-booking product called GetThere, casting doubt on Sabre's continued commitment to develop and support the BTS product. In this paragraph reiterating that concern, the CO also explains a transcription error that she made throughout much of the evaluation process, mistakenly writing that Sabre had recently acquired the BTS instead of GetThere.